IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | 8:13CR244 |
| Plaintiff, ) | |
| ) | FINDINGS AND |
| v. ) | RECOMMENDATION |
| ) | |
| LUIS A. VALLEJO, ) | |
| ) | |
| Defendant. ) | |

This matter is before the court on the Motion to Suppress (Filing No. 52 as amended by Filing No. 72) filed by defendant Luis A. Vallejo (Vallejo). Vallejo is charged in the Indictment with a conspiracy to distribute and possess with intent to distribute methamphetamine (Count I) in violation of 21 U.S.C. § 846 and the possession with intent to distribute more than 50 grams of actual methamphetamine on May 23, 2013, (Count IV) in violation of 21 U.S.C. § 841(a)(1). Vallejo is also charged in a Forfeiture Allegation, along with Jorge Munoz-Ramon (Munoz-Ramon), Luis Meza-Galvez (Meza-Galvez), and Froilan Cuevas (Cuevas), involving seizures of various amounts of U.S. currency in violation of 21 U.S.C. § 853, and the May 24, 2013, possession of methamphetamine with intent to distribute (Count I) in violation of 21 U.S.C. § 841(a)(1). Vallejo seeks to suppress evidence seized by law enforcement officers from an apartment in Omaha, Nebraska, on May 24, 2013.

The court held an evidentiary hearing on August 8, 2013. Vallejo was present with his counsel, J. William Gallup. The United States was represented by Special Assistant U.S. Attorney Martin J. Conboy, IV. The court heard the testimony of Detective Robert Branch, Jr. (Detective Branch) and Officer Adolfo Hernandez (Officer Hernandez) of the Omaha Police Department (OPD), and the defendant Vallejo. The court also received into evidence a search warrant (Exhibit 1) and an affidavit for a search warrant (Exhibit 2). A transcript (TR.) of the hearing was prepared and filed on August 12, 2013.

### FINDINGS OF FACT

In May of 2013, the OPD was investigating methamphetamine trafficking in the Omaha area involving Munoz-Ramon and others (TR. 16). During the investigation, the

OPD identified places and locations of sources for methamphetamine (TR. 17).  Using a cooperating witness (CW), OPD placed the CW in a Hawthorne Suites hotel room and had the CW call Munoz-Ramon informing Munoz-Ramon the CW wanted to make a payment on an outstanding drug debt (TR. 17).  Munoz-Ramon agreed and arrived at the hotel in a Jeep vehicle driven by Cuevas, whereupon the CW came out and met Munoz-Ramon (TR. 17).  The CW and Munoz-Ramon went into CW's hotel room where the CW handed Munoz-Ramon money resulting in the OPD arresting Munoz-Ramon (TR. 17-18).  Prior to his arrival at the Hawthorne Suites, Munoz-Ramon had been under surveillance by the OPD (TR. 18).  OPD observed Munoz-Ramon at a location near 18th and Vinton in Omaha where OPD believed Munoz-Ramon was staying (TR. 18).  OPD observed Munoz-Ramon get into the Jeep driven by Cuevas and go the area of 25th and G Streets in Omaha (TR. 18).  There, both Munoz-Ramon and Cuevas got out of the Jeep and entered Apartment No. 12 at 4131 South 25th Street (TR. 18).  Munoz-Ramon was observed to come out of the apartment and walk to the Jeep and return to the apartment (TR. 18).  Shortly thereafter, Munoz-Ramon and Cuevas left the apartment, entered the Jeep, and drove to the Hawthorne Suites (TR. 18).

Following his arrest, Munoz-Ramon was interrogated and admitted to his involvement in methamphetamine distribution to make money (TR. 19).  Munoz-Ramon stated he was instructed by his supplier, "El Chino", to rent the apartment at 4131 South 25th Street for "El Chino's" boss who was coming into town from California (TR. 19).  Munoz-Ramon was taken to the apartment location, pointed out the apartment and identified the apartment number as 12 (TR. 19).  Munoz-Ramon stated he made a payment of $5,000 earlier at the apartment which was meant for "El Chino" but was accepted by "El Chino's" boss, a large Hispanic male from California (TR. 20).  As Munoz-Ramon was leaving the apartment area, "El Chino" arrived and Munoz-Ramon informed "El Chino" of the payment (TR. 20).

About an hour after Munoz-Ramon's interview (which included some drive-by identifications), Detective Branch, Officer Hernandez (Spanish speaking), and OPD Officer Anderson (Spanish speaking), drove to the apartment at 4131 South 25th Street to conduct a "knock and talk" (TR. 21).  They were dressed in civilian clothes with "POLICE" raid vests

and had their weapons holstered on their belts (TR. 22, 48, 51). Other officers followed a black Mercedes with California plates which just left the apartment area as Detective Branch and Officers Hernandez and Anderson arrived (TR. 21). Detective Branch and the other officers approached the door of Apartment 12 and Detective Branch knocked on the door (TR. 21). Meza-Galvez opened the door (TR. 21). Detective Branch, in English, identified himself and asked for permission to enter the residence (TR. 21). Meza-Galvez, did not verbally respond but left the door open and walked away from the door whereupon Detective Branch and the other officers followed Meza-Galvez into the apartment (TR. 29). Once inside, Meza-Galvez began to speak in Spanish and Officer Hernandez, a Spanish speaking officer, began to act as an interpreter (TR. 22). Meza-Galvez is also known as "El Chino" (TR. 22). Meza-Galvez was asked whether he resided at the apartment and whether he would grant the officers permission to search (TR. 22). Meza-Galvez said he did not reside at the apartment and could not give the officers permission to search (TR. 23). When asked if there were any drugs in the apartment, Meza-Galvez stated there were five pounds of methamphetamine underneath the "boiler" (TR. 23). When Detective Branch entered the apartment, he noticed on the coffee table a large stack of money and an opened ledger book he considered as drug records (TR. 24; 32-33). A protective search of the apartment was conducted and no one other than Meza-Galvez was in the apartment (TR. 24). While the officers were in the apartment, Vallejo arrived at the apartment (TR. 24). Vallejo stated he had been staying at the apartment for eight to ten days, but that it was not his apartment (TR. 24-25). Vallejo also did not grant the officers permission to search the apartment (TR. 24).

Detective Branch left the apartment and prepared an affidavit for a search warrant (TR. 24). The affidavit detailed the drug distribution with Munoz-Ramon earlier in the day and detailed what the officers saw on the coffee table in Apartment 12 at 4131 South 25th Street (Exhibit 2). The affidavit also reflected the statements by Meza-Galvez that there was five pounds of methamphetamine in the apartment (Exhibit 2). After preparation, Detective Branch presented the affidavit to a Douglas County judge who authorized a search warrant for the apartment (Exhibit 1). Thereafter, the search warrant was executed at Apartment 12 and numerous items were seized including methamphetamine, a gun,

United States currency, drug records, packing material, and venue items to Vallejo (TR. 25).

## LEGAL ANALYSIS
### Standing

Vallejo testified he was staying at the apartment and kept certain of his belongings there, including a suitcase (TR. 8-9). To claim Fourth Amendment protection, a defendant must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable. *Minnesota v. Carter*, 525 U.S. 83, 88 (1998); *United States v. Ruiz-Zarate*, 678 F.3d 683, 689 (8th Cir. 2012). The reasonableness of the expectation of privacy must have "a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society." *Rakas v. Illinois*, 439 U.S. 128, 143-44 n.12 (1978); **see also** *Smith v. Maryland*, 442 U.S. 735, 740-41 (1979). "If a defendant fails to prove a sufficiently close connection to the relevant places or objects searched he has no standing to claim that they were searched or seized illegally." *United States v. Barragan*, 379 F.3d 524, 529-30 (8th Cir. 2004). "[A]n overnight guest in a home may claim the protection of the Fourth Amendment[.]" *Carter*, 525 U.S. at 90; **see also** *United States v. Wiest*, 596 F.3d 906, 909, 910 (8th Cir. 2010). The government does not challenge Vallejo's standing in this matter. The court finds Vallejo has standing to object to the search of the apartment.

### Initial Entry

Vallejo argues the officers did not have consent to enter the apartment where they observed the incriminating items on the coffee table which supported the probable cause for the issuance of the search warrant. Vallejo argues Meza-Galvez, "El Chino", did not speak English and therefore could not have provided a voluntary consent to enter the apartment. Detective Branch testified he knocked on the apartment door and when it was opened by Meza-Galvez, he showed his police badge and was dressed in his "POLICE" vest, stated, in English, who he was and asked for permission to come in. Meza-Galvez

stepped away from the door and allowed the officers to enter. The officers did not display their weapons nor did they force their way into the apartment. Meza-Galvez made no protest and walked to the living room as the officers followed him. He said nothing or made no attempt to keep the officers from entering the apartment. Meza-Galvez, like Vallejo, had the authority to allow the officers into the apartment as he was staying at the apartment. Meza-Galvez did not testify in the case and while Vallejo claims Meza-Galvez did not speak English, Detective Branch did not realize Meza-Galvez had problems with the English language until after he attempted to talk with Meza-Galvez in the living room of the apartment when the assistance of a Spanish-language officer, Officer Hernandez, was used. Thus, the action of Meza-Galvez in opening the door, stepping away, and leading the officers into the living room would lead any reasonable law enforcement officer believe he had permission to enter the apartment. As with any factual determinations involving search and seizure, such determinations are judged on an objective standard as to whether the facts as they existed at the time would warrant a reasonable law enforcement officer with reasonable caution and belief to believe Meza-Galvez was consenting to the officers entering the apartment. **See *Illinois v. Rodriguez***, 497 U.S. 177, 188 (1990). "[C]onsent ... can be inferred from words, gestures, or other conduct." ***United States v. Pena-Ponce***, 588 F.3d 579, 584 (8th Cir. 2009). The court finds Detective Branch or any law enforcement officer would have a reasonable belief Meza-Galvez (by his actions) had consented to the entry of the officers into the apartment. **See *United States v. Williams***, 346 F.3d 796, 799 (8th Cir. 2003) (finding consent to entry found where individual opened door wide and stepped aside); **see also *United States v. Carter***, 378 F.3d 584, 588 (6th Cir. 2004) (finding defendant voluntarily consented to entry by police officers into a hotel room when officers were instantly recognizable as police when defendant opened the door and after officers asked permission to enter, the defendant stepped back, making room for officers to enter). The officers acted in good faith on the facts as were presented. The courts finds the officers lawfully entered the apartment. Their entry should not be excluded under the exclusionary rule. **See *United States v. Leon***, 468 U.S. 897 (1984).

### Plain View

"Observing objects in plain view violates no reasonable expectation of privacy, which obviates the need for a search warrant." ***United States v. Banks***, 514 F.3d 769, 773 (8th Cir. 2008). "Under the plain-view exception, officers may seize an object without a warrant if they are lawfully in a position from which they view the object, the incriminating character of the object is immediately apparent, and the officers have a lawful right of access to the object." ***United States v. Beasley***, 688 F.3d 523, 530 (8th Cir. 2012). In this case, as soon as Detective Branch entered the apartment he observed a stack of currency and a opened ledger with names and amounts observable in the ledger. He correctly opined the items were drug records and proceeds. Such observation was consistent with prior reports that the apartment was being used for collecting money on drug sales. Detective Branch had a legal viewpoint and properly included this observation in his affidavit for a search warrant for the apartment (Exhibit 2).

### Search Warrant

In his affidavit for the search warrant, Detective Branch set forth the activities of that day including that of the CW and Munoz-Ramon, the OPD surveillance, Munoz-Ramon's admissions, and the items observed when the officers entered Apartment 12 (Exhibit 2). An affidavit for a search warrant must contain probable cause of four ingredients: time, crime, objects, and place. 2 Wayne R. LaFave, ***Search & Seizure*** § 3.7(d) at 412 (4th ed. 2004). When reviewing the sufficiency of an affidavit "[a] totality of the circumstances test is used to determine whether probable cause exists. Courts should apply a common sense approach and, considering all relevant circumstances, determine whether probable cause exists." ***United States v. Hager***, 710 F.3d 830, 836 (8th Cir. 2013). "[J]udges may draw reasonable inferences from the totality of the circumstances in determining whether probable cause exists to issue a warrant." ***Hager***, 710 F.3d at 836. "Probable cause is established when there is a fair probability that the object of the search warrant may be found in the place to be searched." ***United States v. Romo-Corrales***, 592 F.3d 915, 919 (8th Cir. 2010) (internal quotation omitted).

The court finds the affidavit contained probable cause that drugs, drug proceeds, and other evidence of drug transactions would be found in Apartment 12. Even assuming, arguendo, the facts included after entry into Apartment 12 were excised from the affidavit, the remaining four corners of the affidavit would be sufficient to establish probable cause for the issuance of the search warrant.

**IT IS RECOMMENDED TO JUDGE JOHN M. GERRARD** that:

Vallejo's Motion to Suppress (Filing No. 52 as amended by Filing No. 72) be denied.

### ADMONITION

Pursuant to NECrimR 59.2 any objection to this Order and Findings and Recommendation shall be filed with the Clerk of the Court within fourteen (14) days after being served with a copy of this Order and Findings and Recommendation. Failure to timely object may constitute a waiver of any such objection. The brief in support of any objection shall be filed at the time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.

DATED this 16th day of October, 2013.

BY THE COURT:

s/ Thomas D. Thalken
United States Magistrate Judge